# United States District Court

**RECEIVED**

FEB 1 5 2024

CLERK
U.S. DISTRICT COURT
LINCOLN

for the

## Eighth District of Nebraska

FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA
2024 FEB 15  PM 2: 04

| | | |
|---|---|---|
| Kevin Rogers | ) | Case No. __4:24cv3037__ |
| - plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| National Action Network Inc. | ) | Jury Trial:  Yes __    No X |
| Alfred Charles Sharpton Jr. | ) | |
| Peter Joseph Gleason | ) | |
| Karen-Nicole Knapper | ) | |
| - defendants | ) | |
| | ) | |

# COMPLAINT FOR A CIVIL CASE

## I.     The Parties to This Complaint

Kevin Rogers, National Action Network Inc., Alfred Charles Sharpton Jr.,
Peter Joseph Gleason, Karen-Nicole Knapper

## II.     Basis for Jurisdiction

✓ Federal question     ✓ Diversity of citizenship

### A.     Federal questions at issue

USC 42 §2000d.  Prohibition against exclusion from participation in, denial of
benefits of, and discrimination under federally assisted programs on ground of race,
color, or national origin.

PLEADING PAGE 1 OF 21

## B.   The Amount in Controversy
4,000,000 US dollars.

## III.   Statement of Claim

Beginning in 2006 and continuing to the present, plaintiff has suffered a tremendous injustice at the hands of numerous US government employees as well as employees of a large US university. In March of 2021, plaintiff approached the National Action Network (hereafter NAN) as a supplicant and asked for help. In other words, plaintiff asked NAN to do for him what NAN has done in the past for dozens of individuals. He asked NAN to get his case into the court of public opinion; to publicize his situation or otherwise conduct activism on his behalf.

Between March of 2021 and May of 2023, via emails and online meetings, plaintiff explained very clearly to NAN activists the injustice he had previously endured; he provided documents proving the injustice and he explained why NAN's publicizing the injustice would benefit all Americans.

NAN activists steadfastly refused to help plaintiff and employed various deceiving and obfuscating tactics to cloak their underlying racism. In short, plaintiff believes he has been discriminated against on the basis of his race. Plaintiff further believes the tactics that were employed against him are, in actuality, long-established and long-utilized within NAN, and they directly reflect the policy of NAN's founder and president, defendant Alfred Charles Sharpton Junior (hereafter, Al Sharpton, or Mr. Sharpton).

To the best of plaintiff's knowledge, NAN has never helped a non-African American supplicant during the entirety of its 32 years of operation. Plaintiff submits that this track record

could not be achieved absent a strict, leader-issued policy that would emphatically state: *'We will not help non-African American supplicants.'*

### NAN and Federal Assistance

USC 42 §2000d prohibits "discrimination under federally assisted programs." Plaintiff believes NAN gets significant in-kind assistance from the federal government, only one form of which is its exemption from federal taxes as a 501c organization.

**Exhibits 1a through 1j.** Over many years, NAN has received in-kind assistance in the form of supportive appearances and speeches from numerous high-ranking federal officials.

**Exhibit 1a.** On March 5, 2023 President Biden walked with NAN's founder and leader, Al Sharpton, to commemorate the anniversary of a past civil rights event.

**Exhibit 1b.** President Obama gave the keynote address to NAN's 2014 national convention.

**Exhibit 1c.** President Obama gave his last interview in office to Al Sharpton.

**Exhibit 1d.** Then-Senator Kamala Harris appeared at NAN's 2019 national convention.

**Exhibit 1e.** U.S. Attorney General Eric Holder spoke at NAN's 2013 national convention.

**Exhibit 1f.** US Attorney General Merrick Garland spoke at NAN's 2021 virtual convention, held online due to the Covid-19 outbreak.

**Exhibit 1g.** US Department of Homeland Security Secretary, Alejandro Mayorkas, spoke at NAN's 2021 virtual convention, held online due to the Covid-19 outbreak.

**Exhibit 1h.**  US Department of Homeland Security Secretary, Alejandro Mayorkas, delivered remarks to NAN's 2022 national convention.  (The remarks may or may not have been made in-person.)

**Exhibit 1i.**  Rep. Tom Suozzi gave a plenary address at NAN's 2022 convention.

**Exhibit 1j.**  Rep. Sheila Jackson Lee gave a plenary address at NAN's 2022 convention.

**Exhibit 1k.**  NAN's website says NAN helps people of all races.


**Exhibits 2a through 2e.**  During plaintiff's two years of communication with NAN representatives, plaintiff had various versions of a Youtube "feature video" available for viewing.  Said video explained the injustice done unto plaintiff and offered documents proving it.  The video evolved over the years as plaintiff learned to use video processing software, adding overlays of text and other features.  In addition to having to learn video-making software, plaintiff also faced the daunting challenge of explaining and proving a complex and extremely unusual series of past events.  The explaining and the proving needed to be done quickly, preferably in 15 minutes or less.  Despite their relative crudeness, plaintiff believes even his earliest Youtube feature videos were both understandable and credible.

**Exhibit 2a.**  Plaintiff's Youtube feature video from December, 2020 to February, 2022.

**Exhibit 2b.**  Plaintiff's feature video from February, 2022 to April, 2022.

**Exhibit 2c.**  Plaintiff's feature video from April, 2022 to July, 2022.

**Exhibit 2d.**  Plaintiff's feature video from July, 2022 to February, 2023.

**Exhibit 2e.**  Plaintiff's feature video from February, 2023 to (at least) August, 2023.

**A homemade civil complaint was at plaintiff's Youtube channel**

**&**

**it proved plaintiff's past victimization**


Beginning September 24, 2020 and onward to the present, a version of plaintiff's homemade civil complaint against the university of Pittsburgh et. al. was viewable at his Youtube channel. (Said homemade complaint explained and documented the injustice plaintiff had endured, prior to his contacting NAN.)  There were three versions of said complaint, and they were the consequence of the extreme difficulty plaintiff faced in selecting supporting documents, organizing them, and explaining them.  There was also the complication of plaintiff needing to use one document/complaint/video to address various audiences: lawyers, members of Congress, the general public, and journalists.

Plaintiff did not want to create a document (and a Youtube video) that would, for example, be useful for journalists, but not useful as a civil filing.  Plaintiff believed he needed a single "legal complaint video" for all persons who visited his Youtube channel.

Each of plaintiff's three civil complaint videos were viewable at Youtube at one time or another.  Each offered NAN activists extensive documentation of plaintiff's having suffered injustice at the hands of US government employees as well as employees of the university of Pittsburgh.

**Exhibit 3a.** The first iteration of plaintiff's homemade complaint against Pitt et. al.; it was viewable at plaintiff's Youtube channel from September 24th, 2020 to July 24th, 2022. (Per exhibit 2a, documents supporting the complaint were also viewable at Youtube.)

**Exhibit 3b.** The second iteration of plaintiff's homemade complaint against Pitt et. al.; it was viewable at Plaintiff's Youtube channel from July 24th, 2022 to February 3rd, 2023. (The complaint's supporting documents were all viewable as short videos, grouped into playlists. They are not included in this pleading because they take up 18.4 gigabytes of digital space.)

**Exhibit 3c.** The third iteration of plaintiff's homemade complaint against Pitt et. al.; it was viewable at Plaintiff's Youtube channel from February 3rd, 2023 to the present. (The complaint's supporting exhibits were all viewable as short videos, grouped into playlists. Though they take up roughly 14.1 gigabytes of digital space, they are included in this pleading as exhibit 3d, immediately below.)

**Exhibit 3d.** All the documents that supported exhibit 3c (immediately above), the third iteration of plaintiff's homemade complaint against Pitt et. al., which was viewable at plaintiff's Youtube channel beginning February 3rd, 2023. They are all in video form, as required for uploading to Youtube.


**Exhibit 4.** A compilation of all of plaintiff's email communications with NAN activists; the last communication having occurred on May 19, 2023.


**Exhibits 5a and 5b.** On April 14, 2021 plaintiff had an online video meeting with NAN activists Karen-Nicole "Cole" Knapper, and Paul Schneeberger. The meeting lasted 56 minutes, with Mr. Schneeberger participating only in the first 22 minutes.

Plaintiff believes Ms. Knapper and Mr. Schneeberger had a goal for the meeting. Their goal was to discourage plaintiff and do so in a way that would preclude his obtaining evidence of NAN's racial discrimination. Plaintiff believes various tactics were considered ahead of the meeting, agreed upon, and used. These included: running plaintiff around in conversational circles, steering plaintiff into discussing irrelevant issues, gaslighting plaintiff, and acting stupid (i.e., pretending they did not know how NAN could help plaintiff).

**As regards the tactic of acting stupid: At 05:44 in exhibit 5a**, Ms. Knapper asks plaintiff "what is it that we can do for you?" Though it's a thoroughly dishonest question, plaintiff nonetheless responded by stating his belief that he needed to "get into the court of public opinion."

**At 14:12 in exhibit 5a,** Mr. Schneeberger remarks to Plaintiff: "I don't know -- what to tell you, I don't know how to help you." Plaintiff again expressed his desire to have his situation brought to the public's attention, saying "just get me in the court of public opinion."

**At 21:39 in exhibit 5a**, Mr. Schneeberger says he must exit the meeting. He then makes the vague remark, "I think we're- we're on the same page here." Plaintiff believes the remark was meant for Ms. Knapper. He is affirming that he and Ms. Knapper are in agreement on the general discouraging/gaslighting techniques that were to be used on plaintiff during the remainder of the meeting. When Ms. Knapper says "I really appreciate you taking the time sir" she is thanking Mr. Schneeberger for providing a few minutes of oversight; for showing faith in her ability to continue alone and skillfully utilize the agreed-upon discouraging/gaslighting techniques.

**As regards gaslighting: from 09:08 to 09:50 in exhibit 5a,** plaintiff makes it clear that the injustice he had endured was highly unusual and could not be explained in a mere two minutes.

Yet despite being told this -- and despite it being made apparent by the content of exhibit 2a -- Ms. Knapper repeatedly advised plaintiff to simplify and condense his Youtube feature video down to a two-minute length.  Plaintiff believes, and submits to the court, that there was -- and there remains -- no need for plaintiff to condense his Youtube feature video down to two minutes.  NAN only needed to communicate the following information to the public and/or news journalists:

> "An ordinary American who has a skin disease discovered he could heal perfectly from a burn injury.  Said American worked for years to get scientists to study the disease as a form of improperly-launched burn healing.  When a historic scar-reducing breakthrough in burn care was achieved, US Army doctors and university of Pittsburgh scientists conspired to prevent the ordinary American from getting recognition."

Plaintiff believes the above text constitutes all the explaining -- all the press-releasing -- NAN would need to do to help plaintiff.  The task of explaining and proving details of the injustice done unto plaintiff could be left to plaintiff.

NAN activists would, of course, need to peruse the entirety of both plaintiff's feature video and his homemade complaint against Pitt et. al.  This would be necessary to verify plaintiff's ability to prove his allegation of a past injustice done unto him.  The verification would take many hours and yet, NAN's founder and leader, Al Sharpton, has on numerous past occasions, spent a great deal of time travelling to distant locations to appear and speak on behalf of supplicants.

**From 17:14 to 19:01 in exhibit 5a,** plaintiff makes the point that, if NAN were to publicize his situation, NAN would consequently make accurate information about spray-on skin's origins available to more scientists and this would make more likely another burn care breakthrough.  Ms. Knapper did not express any interest in the issue.

**From 19:01 to 20:25 in exhibit 5a**, plaintiff is told he needs to simplify his Youtube feature video and get it down to a "two-minute elevator pitch."

**From 21:57 to 23:01 in exhibit 5a**, plaintiff again makes the case that NAN could help make another burn care breakthrough more likely, and he says NAN could grow its support base while doing so. Of a possible burn care breakthrough, he says "I think that's something that people at NAN could take pride in." Ms. Knapper responds by spinning the topic back to her assessment that plaintiff needed to simplify his message. Plaintiff believes the lack of interest in the possibility of helping hasten a historic burn care breakthrough is a clear indication of Ms. Knapper's- and NAN's real goal at the time: Discourage plaintiff and get him decisively brushed aside.

**At 38:14 in exhibit 5a**, plaintiff asks Ms. Knapper if she had watched his Youtube feature video. She says she did. (Exhibit 2a is the feature video that was available to Ms. Knapper.) Plaintiff then asks if she remembers the part in the video, at the 11:50 mark, in which he claimed to have an idea for a Covid-19 treatment. (The claim was made for the purpose of stirring up controversy and publicity.) Ms. Knapper says she did not remember said part of the video and further says "I stay pretty busy" and "I watch a lot of stuff." Plaintiff submits that she would have remembered the bombastic Covid-19 gambit within exhibit 2a, if she had indeed watched it.

The court will note that, despite 56 minutes of conversation, Ms. Knapper never refers to any specific content within exhibit 2a. She never says, for example, *'I liked it when you said ...'* or *'I didn't like ...'*.

**At 40:11 in exhibit 5a**, plaintiff explains that he must be able to prove the public lies being told by Australia's renowned Dr. Fiona Wood. Ms. Knapper then asks "Are you able to do

that?" -- which, plaintiff submits, is an ill-intended, gaslighting question that would not be asked by a person who had watched exhibit 2a.

From the 06:55 minute mark to the 10:00 minute mark, exhibit 2a offers some proof of Ms. Wood's public lies. At 02:46 in exhibit 2a, plaintiff asserts that numerous persons have run "an elaborate misinformation campaign" to coverup their use of plaintiff's ideas on burn healing. Plaintiff then points to the video thumbnail of his then-available complaint against Pitt et. al. (i.e., exhibit 3a) and says viewers can "learn all about it" if they watch/read said complaint. As plaintiff points, the thumbnails of numerous videos/documents supporting the complaint appear. It is all stuff that Ms. Knapper would have seen if she had watched exhibit 2a.

Additionally, Ms. Knapper had access to a PDF of plaintiff's then-complaint against Pitt et. al. **Per exhibit 4**, said PDF was attached to an email plaintiff sent to Ms. Knapper on March 19 of 2021.

**Per exhibit 4**, on March 11th and March 15th of 2022, in two emails, plaintiff let Ms. Knapper know he had a new-and-improved Youtube feature video available. (Exhibit 2b is the video.)

**Exhibit 6.** On March 31st of 2022, plaintiff called NAN's headquarters and spoke with an unknown person. Plaintiff asked to have a different activist assigned to help him.

**Per exhibit 4**, on April 18th of 2022, plaintiff emailed Ms. Knapper and asked if she had watched his latest Youtube feature video.

**Per exhibit 4**, Ms. Knapper emailed plaintiff on June 25th of 2022 and stated that she had not had time to attend to plaintiff's case because she had been busy caring for her ailing father.

PLEADING PAGE **10** OF **21**

**Per exhibit 4**, on August 6th of 2022, plaintiff emailed Ms. Knapper and stated that he had uploaded to Youtube another improved version of his feature video. (Exhibit 2d is the video.) Plaintiff also asked to have a different activist take over his case and asserted that his new video "better explains why exposing the overall fraud will make more likely another breakthrough in reducing burn scars." Ms. Knapper responded via email two days later. She stated that she believed plaintiff needed an attorney and she invited plaintiff to attend one of NAN's monthly online "legal night" meetings. She also CC'd her email to NAN's National Field Crisis Director, Derek Perkinson.

Plaintiff submits that there is little honesty in Ms. Knapper's belated realization -- after 16 months -- that plaintiff should speak to an attorney. Such a realization would have occurred much sooner if Ms. Knapper were sincerely trying to help plaintiff.

Plaintiff believes the recommendation that plaintiff speak to an attorney was a hand-off; plaintiff was being handed-off to one of NAN's more experienced brush-off specialists. And Ms. Knapper's CC'ing her email to Derek Perkinson was an alert; she was letting a top NAN honcho know that a non-African American supplicant was refusing to go away and needed attention from a top-notch brush-off specialist.

During the five months spanning October of 2022 to early-March of 2023, plaintiff worked on improving -- yet again -- his Youtube feature video. Plaintiff had no communication with NAN activists during this time.

**Per exhibit 4**, on March 9th of 2023, plaintiff emailed NAN's National Field Crisis Director, Derek Perkinson. Plaintiff emphasized: "If NAN exposed the fraud, more scientists could study spray-on skin, thereby making another scar-reducing breakthrough more likely." (Although Mr. Perkinson began using a new email address in March of 2023, plaintiff believes the changeover

happened in late-March and, thus, his March 9th email would have been received by Mr. Perkinson.)

**Per exhibit 4**, on April 1st of 2023, plaintiff send a two-recipient email to Mr. Perkinson as well as NAN's general counsel, Michael Hardy. Though the email was incorrectly sent to Mr. Perkinson's then-defunct email address, it nonetheless would have been received by Mr. Hardy. Plaintiff again emphasized: "If NAN exposed the fraud, more scientists could study SOS, or study hand eczema, thereby making another scar-reducing breakthrough more likely." And plaintiff clarified further, stating: "SOS works great on partial-thickness burns; not so great on full-thickness ones."

**Per exhibit 4**, on April 8th of 2023, plaintiff again emailed NAN's Derek Perkinson and Michael Hardy. In said email, plaintiff emphasized the public fraud that he believed was happening, stating that "the US Army created a fraudulently-dated video to help Dr. Wood deceive patenting officials"; and that "the Army also, in all likelihood, fraudulently rewrote a legitimate burn research paper to make it seem to be about spray-on skin."

**Exhibits 7a through 7d.** On April 9th of 2023, plaintiff sent identical postal letters to NAN's general counsel, Michael Hardy, and NAN's National Field Crisis Director, Derek Perkinson. The letter to Mr. Hardy was returned as undeliverable, per exhibit 7c. The letter to Mr. Perkinson netted the response that is exhibit 7d.

**Exhibit 8.** Plaintiff participated in NAN's April 27, 2023 online Legal Night meeting. The meetings are held on the last Thursday of each month and are open to all supplicants. During the meeting, plaintiff was called upon and given an opportunity to explain the injustice done unto

him.  Hence exhibit 8, in which NAN's Patrice Perry -- introduced at the April 27 Legal Night meeting as an office manager at NAN -- called plaintiff on May 18 of 2023 and advised plaintiff to call NAN-affiliated attorney Peter J. Gleason.

**Exhibits 9a through 9d.**  Three phone conversations plaintiff had with NAN-affiliated attorney Peter J. Gleason; and with exhibit 9d, a transcript of the audio recording that is exhibit 9c.

Plaintiff wishes to hereby note that he sent Mr. Gleason an email (**per exhibit 4**) four days prior to the conversations documented in exhibits 9b and 9c.  In said email plaintiff characterized his theory on how hand eczema enables scarless burn healing as "laughably simple" and "ridiculously simple."  Plaintiff also explained a number of things relating to spray-on skin that, plaintiff believes, should have caught Mr. Gleason's attention.

Plaintiff explained that Pitt scientist Jorg Gerlach had never previously studied burns or skin when he first succeeded in reducing scars using spray-on skin.  Plaintiff explained that Army doctors helped Mr. Gerlach fraudulently rewrite at least one burn research paper.  Plaintiff expressed his belief that Army employees had published a fraudulently-dated video on Youtube that was used to help Dr. Fiona Wood fool the US patent office.  (Plaintiff also provided the online address for Mr. Gleason to view said video.)  Plaintiff expressed his belief that the Army may have corrupted FDA employees.  Most importantly, plaintiff explained that "although SOS/ReCell works great on partial-thickness (2ne degree) burns, it does not work well on full-thickness (3rd degree) ones"; and "this unfortunate situation could change if researchers around the world were aware of SOS/ReCell's origins in a skin disease."

**As regards exhibit 9a in particular:** On May 19th of 2023, plaintiff spoke briefly with Mr. Gleason who provided plaintiff his email address.

**As regards exhibit 9b in particular:** On May 23rd of 2023, plaintiff again spoke with Mr. Gleason. At the 01:48 minute mark in exhibit 9b, plaintiff informed Mr. Gleason that he had emailed him (**see exhibit 4**) a PDF of his homemade complaint against Pitt et. al.

**At the 03:30 mark in exhibit 9b,** Mr. Gleason confirms receiving plaintiff's email and its attached PDF of plaintiff's complaint against Pitt et. al. At 03:40 Mr. Gleason says he will immediately read the document and plaintiff should call him back in a half-hour. Plaintiff then states that it will take longer than a half-hour to get through the document, to which Mr. Gleason confidently replies "no it won't" -- "trust me, it won't."

Plaintiff submits that Mr. Gleason's confidence in his ability to evaluate plaintiff's 48-page homemade complaint in a half-hour-or-less stemmed from his intentions; from the mission he was performing for NAN. <u>The mission was to tactfully discourage plaintiff and get him brushed-off so NAN could avoid helping a non-African American.</u>

**Bits Within Exhibit 9c Indicating the Ill Intent**

**of**

**Defendant Peter J. Gleason**

**As regards exhibits 9c and 9d in particular:** At 02:12 in exhibit 9c, Mr. Gleason says he watched plaintiff's Youtube feature video (exhibit 2e). At no point within exhibit 9c does Mr. Gleason say anything to substantiate his statement.

PLEADING PAGE 14 OF 21

**At 00:58 in exhibit 9c**, Mr. Gleason asks "where is your proof of what you invented?" It is a preposterous question; decisively answered in exhibit 2e.

**At 01:27 in exhibit 9c**, when plaintiff speaks of old letters he received from scientists, Mr. Gleason uses his lawyerly gotchya skills to interrupt and ask, "what dates were those letters?" (He knew perfectly well that people can rarely recall the exact dates of old letters. He was employing a discouraging/gaslighting technique.)

**At 03:08 in exhibit 9c**, more gaslighting and/or a *feigned* lack of understanding occurs. Mr. Gleason says:

> "So my advice to you is put together the Kevin Rogers file. And say here is
> what I invented and when and -- and you just don't do that. And you basically
> say 'I have eczema. I have a hereditary form of eczema. I have a- you know
> it's a- it's a very unique, it's a very rare form of eczema and I figured out how
> to fix it.' And nowhere does it show me how you fixed it, or what you fixed
> it with."

In exhibit 2e, as well as in his complaint against Pitt et. al., plaintiff clearly explains what he invented and when. Plaintiff absolutely-positively *did not* claim he had "figured out how to fix" eczema.

**From 05:52 to 06:33 in exhibit 9c** there is silence. Plaintiff believes Mr. Gleason was looking through the PDF of plaintiff's complaint against Pitt et. al. to find a new issue to focus on to discourage plaintiff.

**At 06:45 in exhibit 9c**, Mr. Gleason says "it's not a case that I would be inclined to get involved in because … you need a team of lawyers, and investigators, to get to the bottom of [it]." (Here again, Mr. Gleason makes a preposterous statement. Plaintiff's Youtube feature video and his complaint against Pitt et. al. both make very clear that plaintiff had already 'gotten

to the bottom of' who stole his ideas on burn healing.  An attorney representing plaintiff in a civil action against Pitt et. al. would not need to bring in investigators.)

   **From 07:08 to 08:15 in exhibit 9c**, Mr. Gleason's words indicate he is completely ignorant of the vast wealth of information -- the extensive proof-of-past-events -- that is contained in both Plaintiff's Youtube feature video (exhibit 2e) and his complaint against Pitt et. al. (exhibit 3c).

   **At 09:01 in exhibit 9c**, Mr. Gleasons says, "You wanna hit them [i.e., Pitt et. al.] over the head with direct evidence." **Roughly 20 seconds later, at 09:20**, he says "whatever their- you know, their sauce is, whatever their secret sauce is, is under lock and key."

   Within exhibit 2e, which Mr. Gleason stated he had watched, plaintiff very clearly explains the "secret sauce" that makes spray-on skin work.  (See the 01:28 mark and the 07:06 mark in exhibit 2e.)  Exhibit 3c, (a PDF of) which Mr. Gleason was perusing as he spoke with plaintiff, also clearly explains the "secret sauce" although, admittedly, a person would need to settle-in for a few hours to properly peruse the document.

   **At 11:01 in exhibit 9c**, Mr. Gleason asks, "Did you ever apply for a patent?"  (It's another lawyerly gotchya question; an issue raised to discourage plaintiff.  From 11:01 to 12:40, plaintiff assertively schools Mr. Gleason on the difference between holding a patent and owning IP.)

   **At 13:03 in exhibit 9c**, Mr. Gleason raises a new issue to discourage plaintiff.  He says:

> "What you have -- what you had here was an invention and -- now -- uh-.  So, I mean listen, I find it very interesting -- uh -- but it's-.  You know, listen, you put it into a suit and you're gonna see what happens.  And you know, my guess is, it may not be accepted, or, if it is accepted, it's gonna invite a uh -- it's gonna invite a uh -- a motion for summary judgement."

   As the court well knows, *all* civil pleadings "may not be accepted," and they *all* could be said to 'invite a motion for summary [dismissal].'  Plaintiff wishes to hereby mention that, even

if plaintiff's complaint against Pitt et. al. were flawed, this would not preclude NAN from

helping plaintiff access the court of public opinion.

   **At 14:34 in exhibit 9c**, plaintiff tells Mr. Gleason that Pitt et. al. are defrauding taxpayers

and the public. (Within exhibit 2e, plaintiff provides documentation of the fraud at the 05:48

mark; and from 07:07 to 08:30.) Mr. Gleason expresses no interest in the issue of an ongoing

public fraud. He immediately spins the conversation back to a discouraging issue he had

previously hammered on; back to the supposed difficulty of pursuing a civil case against Pitt et.

al. **At 15:03**, he says:

> "Let me just say from the beginning, it's not about the lawyer making money,
> it's about the lawyer having to spend money. And to- to litigate a case like
> this, you're talking, quarter million dollars. Because- what you- if you
> survive a motion for summary judgement, you're gonna have to get a plethora
> of experts … [and experts would have to be hired] to read all of the- the works
> of Wolf, Holcomb, the US Army, Fiona Wood."

   **Per exhibit 2e**, the medical technology underpinning spray-on skin is ridiculously simple

and, too, it is ridiculously obvious, per exhibit 2e, that there would be no need for an attorney

representing plaintiff to hire experts to read the past scientific papers of Wolf, Holcomb, US

Army doctors, and Fiona Wood. Mr. Gleason's assertions were entirely dishonest and were

made in pursuit of his real goal, which was to discourage plaintiff and get him brushed aside so

NAN could avoid helping a non-African American.

   **At 17:40 in exhibit 9c**, Mr. Gleason tosses one last discouraging item at plaintiff. He

brings up the story of the man who invented intermittent wiper blades for cars and says of the

man's legal battles, "it destroyed his life."

   Plaintiff wishes to again remind the court that, for three decades, NAN's primary means of

helping supplicants has been to utilize the court of public opinion. There simply was no reason

PLEADING PAGE **17** OF **21**

for Mr. Gleason to focus relentlessly on the supposed legal weakness of plaintiff's complaint against Pitt et. al.  The court of public opinion does not have super strict evidentiary rules.

**Exhibit 9e.**  Mr. Gleason did not view any of the exhibits supporting plaintiff's complaint against Pitt et. al.  This was despite plaintiff's informing Mr. Gleason of the availability of said supporting exhibits, in an email sent on May 19 of 2023.

Exhibit 9e indicates plaintiff's exhibit videos were "unlisted" on Youtube.  Their unlisted status only means they did not appear as individual videos, but were viewable if a visitor clicked on playlists plaintiff had created.  The court will note that, per exhibit 9c, Mr. Gleason never said anything about any of the exhibits plaintiff had made available, nor did he say he had been unable to access them.  He simply made no effort to view them.


**Exhibit 10.**  On March 18 of 2021, NAN's Karen-Nicole Knapper subscribed to plaintiff's Youtube channel and remained subscribed until at least August 23 of 2023.  Plaintiff believes Ms. Knapper was aware of plaintiff's race (per the first email shown within exhibit 4) and her subscribing to plaintiff's Youtube channel was not a well-intended act.


## IV.  Compensatory Relief

Plaintiff seeks compensatory damages of 4,000,000 US dollars.


**As regards economic damages:** Due to the *extremely* unusual nature of the injustice done unto plaintiff by Pitt, the US government, et. al., plaintiff could not get a lawyer prior to his

PLEADING PAGE **18** OF **21**

contacting NAN. Plaintiff consequently had to write his own complaint against Pitt et. al.; this had to be done to provide NAN with proof of the past injustice plaintiff had endured.

Plaintiff also had to create a Youtube video that would summarize and explain and *prove* -- within a limited time-frame -- the past injustice he had endured. Plaintiff could not simply dump a 40- or 50- page civil pleading onto the lap of anyone at NAN; no one would ever read it. Something more easily digested had to be created to serve as an appetizer and that something was plaintiff's Youtube feature video.

Creating both a summarizing video and a definitive, convincing civil pleading was an enormous task. Plaintiff estimates he spent some 1,600 hours acquiring and combining the skills of a lawyer, a video editor, and an investigative journalist. The documents were voluminous and had to be meticulously organized, presented, and explained; anything less and NAN activists would justifiably be too fearful of spawning defamation lawsuits to proceed.

**As regards non-economic damages:** Plaintiff has suffered a loss of enjoyment of life, mental anguish, and impairment of his quality of life. His dealings with NAN were a miserable and emotionally draining experience, as it became clear that no one at NAN was acting in good faith. NAN's representatives essentially piled more suffering on top of suffering plaintiff had previously been subjected to at the hands of scientists, US Army doctors, et. al. -- much like an attorney who deceitfully withholds a civil damage judgement from a client, while lying about appeals outcomes.

PLEADING PAGE **19** OF **21**

**As regards punitive damages:**  Over a two-year time frame, using emails, postal letters, online video meetings, and phone conversations, plaintiff alerted NAN representatives to the following items or issues:

    a) that there was a large-scale public fraud happening; a big lie being fed to the public.

    b) that various persons, including US government employees, had deceived the US patent office.

    c) that there was reason to believe various persons may have corrupted the FDA.

    d) that various persons had been lying for years to members of Congress.

    e) that there was a possibility of NAN activists becoming international heroes -- if they publicized plaintiff's situation -- and if, as a consequence, scientists who were previously unaware of spray-on skin's true origins began studying it, and they achieved a further scar-reducing breakthrough in burn care.  Such a breakthrough would benefit all humanity, forevermore.

NAN activists were made aware of some, or all, of the above issues and yet -- they refused to help plaintiff.

## V.  Injunctive Relief

Plaintiff asks that the court enjoin defendant NAN to permanently display on its website the statement or advisement that "NAN focuses primarily on helping African Americans" -- or a comparable statement using similar wording.

Plaintiff believes displaying such a statement should not be intrinsically demeaning to NAN or NAN activists.  Many charitable and/or activist organizations proudly and honorably serve

only one specific racial, ethnic, or religious group.  What is dishonorable is an organization's claiming to serve all when, in fact, it does not.

Respectfully submitted,

*Kevin Rogers — plaintiff*

PLEADING PAGE **21** OF **21**